## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JALEN GREEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  1:16-CV-1047-VEH** |
| | ) | |
| **JACKSONVILLE STATE** | ) | |
| **UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

## I.    Introduction

Plaintiff Jalen Green ("Mr. Green") initiated this discrimination in education case on June 28, 2016, against Jacksonville State University ("JSU") and several individual Defendants (sued in their personal capacities only). Mr. Green has sued Defendants under Title VI of the Civil Rights Act of 1964,[1] 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Alabama law. (Doc. 1 at 2 ¶ 2). Mr. Green's most recent pleading

---

[1]  Title VI provides in pertinent part that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

is a Corrected Repleaded Complaint[2] (Doc. 29) filed on October 29, 2016.[3]

Pending before the court is a Motion To Dismiss (Doc. 47) (the "Partial Motion") filed by Defendants Jacksonville State University ("JSU"), Dr. Kenneth Bodiford ("Dr. Bodiford"), Dr. Timothy King ("Dr. King"), and Dr. Christopher Probst ("Dr. Probst") (collectively Drs. Bodiford, King, and Probst are sometimes referred to as the "Individual Defendants")[4] on January 6, 2017. The claims at issue in the Partial Motion are limited to:

- Count I (Doc. 29 ¶¶ 92-100) against Dr. Bodiford for violation of the equal protection clause asserted pursuant to § 1983 and § 1981;

- Count II (Doc. 29 ¶¶ 101-08) against Dr. Bodiford for tort liability asserted under Alabama law;

- Count I (Doc. 29 ¶¶ 109-115) against Dr. King for violation of the equal protection clause asserted pursuant to § 1983 and § 1981;

- Count I (Doc. 29 ¶¶ 116-121) against Dr. Probst for violation of the equal protection clause asserted pursuant to § 1983 and § 1981;

- Unnumbered Count (Doc. 29 ¶¶ 182-88) against "Individual

---

[2] The pleading's complete title is "Errata-Corrected, Corrected Repleaded Complaint". (Doc. 29 at 1).

[3] Mr. Green has filed a total of four complaints. (Docs. 1, 23, 28, 29)

[4] Individual Defendants Mark Knauss ("Mr. Knauss") (who is representing himself) and Austin Waits ("Mr. Waits") (who has separate defense counsel) are not parties to this Partial Motion. Further, both have answered (Docs. 33, 36) Mr. Green's Corrected Repleaded Complaint.

Defendants" for intentional and negligent infliction of emotional distress under Alabama law; and

- Count I (Doc. 29 ¶¶ 151-165) against JSU for a claim of a racially hostile environment in education (or student-on-student racial harassment) arising under Title VI.

Mr. Green opposed Defendants' Partial Motion on February 25, 2017. (Doc. 52).

Defendants followed with their reply (Doc. 55) on March 6, 2017.

Having carefully considered the contentions raised by both sides, the Partial Motion is **GRANTED IN PART**, **DENIED IN PART**, and otherwise **TERMED** as **MOOT**.

## II.     Standards

### A.     Rule 12(b)(6) Dismissal Standard

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* FED. R. CIV. P. 12(b)(6) ("[A] party may assert the following defenses by motion:  (6) failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting FED. R. CIV. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955,

1965, 167 L. Ed. 2d 929 (2007); *see also* Fed. R. Civ. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (emphasis added). "Under *Twombly*'s construction of Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line

4

from conceivable to plausible.' *Ibid.*" *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

## B.    Motion for Judgment on the Pleadings[5]

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). As the Eleventh Circuit has explained the Rule 12(c) standard:

> Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts. *See Bankers Ins. Co. v. Florida Residential Property and Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998) (citing *Hebert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)); *see*

---

[5]  Mr. Green has argued in opposition that JSU is foreclosed from seeking a dismissal of Count I (*i.e.*, Title VI student-on-student racial harassment) pursuant to Rule 12(b)(6) because it has already answered Mr. Green's Corrected Repleaded Complaint. (Doc. 52 at 10). Defendants counter that JSU did not answer the allegations pertaining to that particular count in light of the pending Partial Motion. (*See* Doc. 46 at 15 ("These paragraphs require no response from JSU at this time.)). To the extent Mr. Green is correct, the court has treated the Partial Motion as one in which JSU seeks dismissal pursuant to Rule 12(c)–which standard substantively mirrors that of 12(b)(6).

*also* Rule 12(c), FED. R. CIV. P. When we review a judgment on the pleadings, therefore, we accept the facts in the complaint as true and we view them in the light most favorable to the nonmoving party. *See Ortega*, 85 F.3d at 1524 (citing *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 57 (5th Cir. 1978)). The complaint may not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Slagle*, 102 F.3d at 497 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101–02, 2 L. Ed. 2d 80 (1957) & citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S. Ct. 2891, 2916-17, 125 L. Ed. 2d 612 (1993)).

*Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

Further, "[w]hether the court examine[s] [a pleading] under Rule 12(b)(6) or Rule 12(c), <u>the question [remains] the same: whether the [complaint] stated a claim for relief</u>." *Sampson v. Washington Mut. Bank*, 453 F. App'x 863, 865 n.2 (11th Cir. 2011) (emphasis added) (quoting *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.,* 305 F.3d 1293, 1295 n.8 (11th Cir. 2002)); *Sampson*, 453 F. App'x at 865 n.2 (applying *Strategic Income* and concluding that court's error in granting a dismissal under Rule 12(c) instead of Rule 12(b)(6) was harmless).

## C.    Qualified Immunity

The Individual Defendants assert that qualified immunity bars Mr. Green's federal claims brought against them in their individual capacities. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Cottone*, 326 F.3d at 1357.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function[.]" *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.[6]

_____

[6] Here, Mr. Green offers no plausible contention showing that Drs. Bodiford, King, and Probst were acting outside the scope of their discretionary authority. (*See, e.g.*, Doc. 29 ¶ 5 ("[Dr.] Bodiford was, at all times relevant hereto, acting under color of law and within the scope of his employment [as Director of Bands for JSU]."); (*id.* ¶ 6 ("At all times [Dr.] Probst acted under color of law and within the scope of his agency and employment [as trumpet instructor for JSU].")); (*id.* ¶ 7 ("At all times relevant hereto, [Dr.] King was acting under color of law and within his agency capacity [as a supervisory official and Vice President of Student Affairs for JSU].")). While Mr. Green vaguely mentions that Dr. King "does not even clear this first hurdle" because he investigated discrimination complaints even though he was "a named perpetrator" (Doc. 52 at 7 n.1), Mr. Green references no specific allegations contained in his Corrected Repleaded Complaint in support of this attempted argument. Further, he makes no attempt to reconcile Dr. King's lack of discretionary scope with the foregoing language from his Corrected Repleaded Complaint which affirmatively asserts that Dr. King was acting within the scope of his discretionary authority.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), *modified in application by Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 813, 172 L. Ed. 2d 565 (2009) (holding that "*Saucier* procedure should not be regarded as an inflexible requirement"). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[7] *Anderson v.*

---

[7] Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the

*Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087,

---

highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818, in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

In determining whether the plaintiff meets this burden in the context of a

motion to dismiss, the court is guided by the Eleventh Circuit's recent holding in

*Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010), which clarifies that <u>the heightened</u>

<u>pleading rule no longer applies to civil rights cases in which a qualified immunity</u>

<u>defense is asserted</u>:

> While *Swann*, *GJR*, and *Danley* reaffirm application of a heightened pleading standard for § 1983 cases involving defendants able to assert qualified immunity, <u>we agree with Randall that those cases</u> <u>were effectively overturned by the *Iqbal* court. Pleadings for § 1983</u> <u>cases involving defendants who are able to assert qualified immunity as</u> <u>a defense shall now be held to comply with the standards described in</u> <u>*Iqbal*</u>. A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth-legal conclusions must be supported by factual allegations. The district court should assume, on a case-by-case basis, that well pleaded factual allegations are true, and then determine whether they plausibly give rise to an entitlement to relief. . . .
>
> After *Iqbal* it is clear that there is no "heightened pleading <u>standard" as it relates to cases governed by Rule 8(a)(2), including civil</u> <u>rights complaints</u>. All that remains is the Rule 9 heightened pleading standard.

*Randall*, 610 F.3d at 709-10 (emphasis added) (footnote omitted).

## III.    Mr. Green's Factual Allegations

Defendants have indicated that they dispute many of Mr. Green's allegations.

(Doc. 47-1 at 5).[8] However, at the pleadings stage, the court must accept Mr. Green's

well-pleaded facts as true. Accordingly, the following factual allegations are taken

---

[8]  All page references to Doc. 47-1 correspond with the court's CM/ECF numbering system.

directly from Mr. Green's Corrected Repleaded Complaint (subject only to some minimal modifications to give context to the court's analysis).

## JSU Background

JSU is a recipient of federal funding. (Doc. 29 ¶ 4). JSU has a Music Department and a marching band named the "Marching Southerners Marching Band" ("MSMB"). (Doc. 29 ¶¶ 4, 5, 13, 14).

Dr. Bodiford works for JSU's Music Department, is the MSMB band director, and has authority over the band program. (Doc. 29 ¶ 5). Dr. Bodiford has substantial control over the harassers, including the context in which the harassment occurred, and has authority to take remedial and disciplinary action. (Doc. 29 ¶ 5).

Dr. Probst is a JSU employee and trumpet instructor in the Music Department. (Doc. 29 ¶ 6). Dr. Probst has oversight and supervision of the trumpet section and the authority to take remedial and disciplinary action against the harassers. (Doc. 29 ¶ 6). Dr. King, the Vice President of JSU, is a supervisory official and in a position to address Mr. Green's complaint(s) at the time of the actions alleged. (Doc. 29 ¶ 7).

Drs. King, Bodiford, and Probst are "appropriate officials" for purposes of receiving complaints under Title VI as defined by the 2016 JSU Handbook. (Doc. 29 ¶¶ 5-7). Mr. Knauss and Mr. Waits (who Mr. Green has sued) were members of the MSMB's leadership council and/or section leaders. (Doc. 29 ¶¶ 8, 9).

The MSMB's leadership hierarchy consists (in descending rank order) as follows: 1) the Director of Bands, 2) instructional staff; 3) Secretary of the University Bands; 4) Leadership Council (includes all instructors and section leaders); 5) the Drum Majors, 6) the "section leaders" (aka "section leads") - e.g. student leaders of a respective instrumental section. (Doc. 29 ¶ 19).

At no time prior to 2016 did JSU have a policy (at least none that was publicized to students) defining and prohibiting racial and/or retaliatory harassment (whether peer-on-peer, or faculty-on-peer) and explaining procedures for reporting and resolving complaints of racial or retaliatory harassment. (Doc. 29 ¶ 13). Likewise, other than a broad statement of support for nondiscrimination, JSU had no published procedures for reporting and resolving complaints of invidious discrimination or retaliation. (Doc. 29 ¶ 13). The DOE Office of Civil Rights concluded as much following an investigation in 2014. *Id.*

According to the MSMB Handbook, authored by Dr. Bodiford, as Director he is "responsible for the total band program." (Doc. 29 ¶ 16). Accordingly, Dr. Bodiford determines the rules, policies, structure, membership and organization of MSMB. *Id.* Although Dr. Bodiford relies upon a hierarchical, chain-of-command structure -- consisting of instructors, students and staff with delegated authority over particular functions – to run the program, he retains plenary authority to "remove anyone from

the program for any reason ...." *Id.* As the penultimate leader of MSMB, Dr. Bodiford sets the tone and culture of the organization. *Id.*

Dr. Bodiford requires that MSMB members follow a "Leadership Model" that emphasizes a "strict chain of command." (Doc. 29 ¶ 18). Specifically, MSMB is organized as a top-down hierarchy, with new initiates – called "slugs"—occupying the lowest rank in this pecking order. *Id.* Under the chain-of-command model, a band member is required to submit any complaint or request, including a complaint of discrimination, to his immediate superior, even if the immediate superior is the cause of the complaint. *Id.* New initiates are indoctrinated into this rigid system on their first day of mandatory band camp, and its importance is impressed upon them continuously. (Doc. 29 ¶ 18). To breach the chain-of-command is regarded as virtually unthinkable. (Doc. 29 ¶ 18).

Dr. Bodiford delegates to section leads absolute authority to manage and supervise their section members and enforce his policies. (Doc. 29 ¶ 21). This includes authority to convene and supervise practice sessions, to grant or deny requests for leaves of absence, to evaluate performance of individual members and decide their rank and placement within the line; to grade members thus determining whether they receive academic credit for band class; to address complaints of discrimination; to discipline members; to administer the section's respective social

media platforms, including the respective section's Facebook page; to assign solo opportunities; to supervise the section during mandatory band camp; and to assign other tasks and duties. *Id.* Section leads serve as employees and agents of Dr. Bodiford and, by extension, of JSU. *Id.*

## Mr. Green's Student-on-Student Racial Harassment Allegations

Mr. Green auditioned for MSMB in August 2011, was awarded two music scholarships from JSU, officially enrolled in JSU for the 2011-112 academic year, and became a member of MSMB assigned to the trumpet section or the "Southerners Trumpet Line" ("STL"). (Doc. 29 ¶ 26). Mr. Green also attended band camp at JSU in August 2011. (Doc. 29 ¶ 28). Dr. Bodiford was present at band camp. *Id.*

It was during band camp that Mr. Green, then only 17 years old, was first exposed to the racially hostile climate that permeates STL. (Doc. 29 ¶ 30). Specifically, during this two-week program, section leads and veteran members, all of them white, ridiculed and taunted Mr. Green on the basis of his race and color. *Id.* This included repeatedly calling him "nigger", and making racist jokes that publicly humiliated him in front of the overwhelmingly white section members and new recruits. *Id.* STL members who engaged in this abusive treatment told Jalen it was an STL "tradition" – ostensibly employed to "break" incoming freshman (known in band parlance as "slugs") of "racial sensitivity." (Doc. 29 ¶ 32). Several veteran members

drove cars affixed with the "rebel flag" at the back. *Id.*

Dr. Bodiford was within earshot on several occasions when STL members referred to Jalen in racial epithets. (Doc. 29 ¶ 33). He also was in a position to observe the confederate flag on cars driven by members on campus. *Id.* He did nothing to stop any of this. *Id.*

Mr. Green continued to endure taunts, "jokes" and epithets, including being regularly referred to as "nigger" or "nigga". (Doc. 29 ¶ 34). As a "slug" at the bottom of the pecking order, in an overwhelmingly white organization, run by white leaders, and headed by a white Director that required him to perform "Dixie" and follow a chain-of-command that effectively silenced him, Mr. Green simply endured this humiliation by focusing on his music. *Id.* Two other African American "slugs" dropped out after their first year. *Id.*

Some examples of statements made by white band members and section leads include, but are not limited to:

a. Routinely referring to African Americans, including Mr. Green, as "nigger" or "nigga";

b. Routinely comparing African Americans to "monkeys";

c. Told to "go pick cotton because it doesn't matter what black people think" in response to Mr. Green expressing an opinion;

d. Told Mr. Green that he was only able to play as well as he did

"because of his big black lips."

e. Admonished by section leads if Mr. Green was late for a practice that he was "running on black people time" because they are always late.

f. Referred to as a "gang member that always steal and run from cops."

g. Told Mr. Green could not be understood because he "spoke Ebonics."

h. Referred to as an ape.

i. Told to go and eat a banana.

j. Verbally passed down the Trumpet Line from section lead, while all were in uniform and during a performance, "nigger tongue my anus."

k. When boarding a bus for travel to a game, was instructed that "black men sit in the back of the bus."

l. While wearing a hoodie, was advised by band members to "be careful wearing a hoodie on campus, because look what happened to Trayvon Martin."

m. told that African Americans are "all criminals", "murderers", and "rapists."

n. Told that an African Americans singer, L'il John "sucks, I hate when they take our music and ruin it".

o. When in the bleachers at historically black colleges, members shouted racist remarks and degraded the performances as inferior because of the respective band's racial composition.

(Doc. 29 ¶ 35). Another band member repeatedly warned Mr. Green that he would be

"hanging from one of the trees outside of Mason Hall" if he did not finish his chores.

(Doc. 29 ¶ 36).

Some examples of jokes made by band members and section leads at Mr. Green's expense include, but are not limited to:

a. What is long and black? The unemployment line.

b. What did God say when he made his first black guy? Oops, burnt another one.

c. A Mexican and a black guy are riding in a car, who's driving? A cop.

d. What does a black man do after sex? 15 years to life.

e. What's the difference between a dead dog on the street and a dead black guy on a road? The dead dog has skid marks and didn't deserve it.

f. How can you tell a black guy had sex? His eyes are red from mace.

g. Why don't black people dream? Because the last one got shot.

h. What does a black boy get for Christmas? My bike that was stolen.

i. What would Martin Luther King be today if he were alive? White.

j. "How do you know when a black girl is pregnant? Stick a tampon in her and if it comes out with the cotton picked off, there's a little nigger in her."

(Doc. 29 ¶ 37). Drs. Bodiford and Probst were present at times when the foregoing jokes, hateful remarks, and insults occurred. (Doc. 29 ¶ 38).

Dr. Bodiford never provided any training or education to the band on racial sensitivity nor implemented any policy prohibiting racial harassment or invidious

discrimination, notwithstanding the high attrition rate of black members and the obviously disproportionately white composition of the band, and its leadership. (Doc. 29 ¶ 41). Dr. Bodiford was the ultimate authority figure and policy-maker for MSMB, as set forth in his self-authored Handbook. (Doc. 29 ¶ 42).

STL members additionally posted racist memes and jokes on the STL Facebook page. (Doc. 29 ¶ 43). Dr. Bodiford delegated to STL leads his authority (per the Policy Guidance on Social Media) to administer and curate the STL Facebook page. (Doc. 29 ¶ 45). Dr. Bodiford did not train nor educate members regarding proper use of this platform, nor provide them with the JSU policy guidance. *Id.*

Some examples of Facebook posts include, but are not limited to:

a. On February 15, 2014, Joel Haney, a white student member of the STL, posted a denigrating, racist image on the STL Facebook page involving multiple racist stereotypes. The post was made in specific reply to another STL member's posted opinion that Mr. Green resembled a black basketball player. Haney's post depicted Mr. Green as an African American child in classic "Pickaninny" form, with a bone as a hair accessory, holding a basketball, and feasting on watermelon and fried chicken. On information and belief, the humiliating comparison was viewed by all of Mr. Green's bandmates, and "liked" by many.

b. On August 6, 2014, Mr. Knauss, Head STL section lead and administrator of the STL Facebook page, informed STL members that as part of the hazing policy he was required to add Drum Majors – also students -- to the STL page. He cautioned his group not to post anything that could "potentially hurt us or give away STL tradition." However he closed the post with "Next to that…Continue as you were. Offend

away." On information and belief, this post was read by all STL members.

c.  In September of 2015 Ben Johnson (white), posted what he described as a "good slug joke." The post contains a disgusting racial slur against African Americans. Captioned "BLACK PREGNANCY TEST", the post depicts an image of a chicken drumstick with a bite taken out of it. At the bottom of the image it read: PUT A PIECE OF CHICKEN IN THE VAGINA. WAIT 30 SECONDS. IF THERE'S A BITE OUT OF IT THEN THERE'S A LITTLE NIGGA IN THERE. The post was viewed by 42 members.

d.  Days after the foregoing post, STL member Brett Matthew Pierce (white), posted a rejoinder stating that he had "made fried chicken. Jalen Green was thought about the entire time." On information and belief, this post was viewed by all STL members and "liked" by eight, including HEAD section leader and Facebook administrator Mr. Knauss.

e.  On October 8, 2015, Mr. Knauss himself posted a conversation he had had with Mr. Green wherein he called Mr. Green a "boss ass nigga who arrives [in class] when ever the fuck he wants]", a reference to the stereotype of "black time".

(Doc. 29 ¶ 46). Mr. Bodiford caused Mr. Knauss to add Drum Majors to STL's

Facebook page in summer 2014 "as part of the new hazing policy." (Doc. 29 ¶ 47).

In the summer of 2015 Mr. Green so dreaded returning to STL band camp, and

enduring yet another year of STL humiliation, that he told his parents he wanted to

drop out. (Doc. 29 ¶ 53). However, Mr. Green's parents urged him to reconsider.

(Doc. 29 ¶ 54). Mr. Green ultimately decided to return to JSU and finish his degree.

*Id.* He also determined he would confront his STL tormentors directly, as he was

required to do per STL chain-of-command. *Id.* However upon attending band camp and suffering another humiliating demotion, followed by further racist ridicule, Mr. Green lost his nerve to confront his oppressors and slipped into deeper depression and futility. (Doc. 29 ¶ 55).

As JSU had no published guidance on racial harassment and discrimination, much less published procedures for reporting such treatment, Mr. Green was not aware of any avenue of recourse other than the chain-of-command of MSMB. (Doc. 29 ¶ 56). This required keeping his grievance "in-house" by complaining to his section leads -- the very persons who tormented him and condoned and encouraged such treatment by other members. (Doc. 29 ¶ 56).

### Mr. Green's Reports of Racial Harassment and JSU's Reaction

On October 12, 2015, Mr. Green's parents urged him to breach STL chain-of-command and demand help from Drs. Bodiford and Probst. (Doc. 29 ¶ 58). On October 16, 2015, Mr. Green met with Dr. Bodiford and described the years of racial harassment and disparate treatment he suffered. (Doc. 29 ¶ 59). He specifically told Dr. Bodiford that STL leads participated in and condoned this mistreatment. *Id.*

Dr. Bodiford told Mr. Green that he would address the situation immediately. (Doc. 29 ¶ 60). Two weeks passed. (Doc. 29 ¶ 61). Dr. Bodiford took no action to halt the conduct. (Doc. 29 ¶ 61).

On October 26, 2015, Mr. Green's parents decided they needed to press Dr. Bodiford to move. (Doc. 29 ¶ 62). Mr. Green's father reiterated to Dr. Bodiford the rampant racial harassment within STL that was perpetrated and condoned by both members and its section leads. *Id.* He emphasized the need for immediate action. *Id.* Dr. Bodiford told Mr. Green and his parents that he "did not want people like this in the band program." (Doc. 29 ¶ 63). Nonetheless Dr. Bodiford continued to sit on his hands and do nothing. *Id.*

Following several more urgent emails demanding Dr. Bodiford take action, on November 4, 2015, Dr. Bodiford met with section leads – the very perpetrators of the discrimination – and instructed them to remedy the situation. (Doc. 29 ¶ 64). One STL member described Bodiford's discussion with leads as a "very watered down lecture that made it unclear what the problem was …." (Doc. 29 ¶ 67).

After this meeting STL leads shared with members that someone had snitched to Dr. Bodiford and revealed the racist harassment and discrimination. (Doc. 29 ¶ 65). The STL leads questioned two African American members to determine if one was the culprit. *Id.* The leads soon deduced that it was Mr. Green who complained. *Id.*

On November 4, 2015, Dr. Bodiford emailed Mr. Green's parents to inform them that he had discussed the problem with STL. (Doc. 29 ¶ 66). He stated his "hope" that this would put an end to the problem. *Id.* He also told Jalen's parents that

he would "monitor [STL members] closely throughout the rest of the season" and would ask for funding "to bring in a speaker to speak to the band next year during band camp. I think that would be good to start the season off addressing issues like this with everyone…." *Id.*

At some point after Dr. Bodiford's lecture, STL member Caleb McFall (white) posted to STL's Facebook page a terroristic image of a Confederate battle flag, pitched against a rainbow backdrop, ringed by Jewish Stars of David, framing its central symbol: a large, blazing swastika. (Doc. 29 ¶ 68). McFall captioned the image, "#therealSTL." (Doc. 29 ¶ 68). Another white STL member, Dylan Flowers, commented on the post: "Is that the new STL flag? It makes sense". (Doc. 29 ¶ 69). Four members "liked" the post. *Id.*

Mr. Green understood this hateful, terroristic image of white supremacy as a direct threat. (Doc. 29 ¶ 70). He feared for his safety. *Id.* Dr. Bodiford continued to do nothing; the post remained up. *Id.* As November wore on, Mr. Green experienced continued harassment and intimidation. (Doc. 29 ¶ 71). His parents alerted Dr. Bodiford. *Id.* Bodiford did nothing. *Id.* The post remained up. *Id.*

On November 11, 2015, Mr. Green alerted Dr. Probst that he felt scared and threatened, describing his travails and the threatening swastika post. (Doc. 29 ¶ 72). Dr. Probst took no action. *Id.* Rather he reiterated that Mr. Green should forward any

complaints of racial harassment to the STL section leads. *Id.*

On November 13, 2015, Mr. Green's parents informed Dr. Bodiford that the Confederate/Swastika posting remained on STL's official Facebook page, despite his assurance to "closely monitor" STL for the remainder of the semester. (Doc. 29 ¶ 73). They told Dr. Bodiford they were afraid for their son's safety. *Id.* Dr. Bodiford did nothing. (Doc. 29 ¶ 74). The post remained up. *Id.*

Realizing that no one in a position of authority would help him, that the situation was futile and that he needed to escape, in mid-November Mr. Green wrote an open letter to STL on the Facebook page, outing himself as the member who had complained to Dr. Bodiford. (Doc. 29 ¶ 75). Some STL members lashed out at him and rebuked him for "snitching," breaking chain-of-command and "running to" Dr. Bodiford. (Doc. 29 ¶ 76). Others criticized him for making a "big deal" of the racist harassment they acknowledged occurred over years, advising that he should have ignored or "overlooked" it. *Id.* Still others breezily admitted their involvement or complicity in the racist culture within STL. *Id.*

Section Lead Mr. Waits excoriated Mr. Green for breaking the chain-of-command and disrespecting his section leads. (Doc. 29 ¶ 78). He demanded that Mr. Green call him, warning "here's your chance to make me respect you again." *Id.*

On November 23, 2015, Mr. Waits called Mr. Green at home and threatened him with physical violence in retaliation for his speaking out. (Doc. 29 ¶ 80). He also threatened to flunk Mr. Green if he did not attend practices. *Id.* Mr. Green and his parents reported Mr. Waits's conduct to Drs. Probst, Bodiford and King. *Id.* Mr. Waits was not disciplined, or even talked to at all. *Id.*

Dr. King turned the matter over to the police, explaining to Mr. Green's parents that the matters complained of were "serious" and warranted a criminal investigation. (Doc. 29 ¶ 81). The police found no criminal violation and turned the matter back over to Dr. King. (Doc. 29 ¶ 81). Dr. King let the matter drop. (Doc. 29 ¶ 82). Dr. Bodiford did nothing. (Doc. 29 ¶ 83). Neither official conducted any investigation, nor disciplined any member. (Doc. 29 ¶ 84). With both Mr. Green and his parents worried for his safety, and in light of the official indifference to his plight, Mr. Green felt he had no option but to withdraw from JSU effective at the end of the semester in December, 2015. (Doc. 29 ¶ 85).

After his withdrawal from JSU, Mr. Green received a letter from Dr. King identifying Mr. Green as the complainant and informing him that disciplinary hearings were scheduled on Wednesday, October 5, 2016, for the accused parties relating to an incident that might be a violation of the JSU Student Code of Conduct. (Doc. 29 ¶ 90). While Dr. King's letter was dated September 30, 2016, it was

postmarked on October 3, 2016, and not delivered to Mr. Green until late afternoon on October 5, 2016, after the hearings had occurred. (Doc. 29 ¶ 91).

## IV. Analysis

### A. Preliminary Considerations

#### 1. Mr. Green's Abandoned Tort Claims

In reply, Defendants maintain that all tort claims–including intentional and negligent infliction of emotional distress–asserted against the Individual Defendants have been abandoned by Mr. Green because he did not in any way respond to Defendants' arguments about why such claims were precluded by state-agent immunity. (Doc. 55 at 2); *see also Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality opinion) (emphasis by underlining added), *holding for category (4) of Cranman modified by Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006). Having reviewed Mr. Green's opposition, the court agrees with Defendants that Mr. Green has completely failed to counter the Individual Defendants' state-agent immunity defense to his tort claims.[9]

Further, due to that critical omission, he has abandoned all tort claims. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding

---

[9] The court disagrees with Defendants' suggestion that Mr. Green also has possibly asserted this state-law count against JSU–that claim's scope is unambiguously limited to individual defendants. Consequently, that portion of its Partial Motion is **TERMED** as **MOOT**.

claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned. (citing *Dunmar*, 43 F.3d at 599); *cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Accordingly, the state law portion of the Partial Motion is **GRANTED**, and Count II (Doc. 29 ¶¶ 101-08) asserted against Dr. Bodiford is **HEREBY DISMISSED**

**WITH PREJUDICE**. Further, the unnumbered count (Doc. 29 ¶¶ 182-88) for intentional and negligent infliction of emotional distress is **HEREBY DISMISSED WITH PREJUDICE** as it pertains to Drs. Bodiford, Probst, and King (only).[10]

### 2.    Mr. Green's Abandoned Federal Claim Against Dr. Probst

In his opposition, Mr. Green makes the following statement about his equal protection claim (Count I (Doc. 29 ¶¶ 116-121)) brought against Dr. Probst in his personal capacity pursuant to § 1983:

> Although plaintiff also believes there is sufficient factual predicate for § 1983 . . . liability against Probst, he believes it prudent to complete discovery in order to cement these claims. Therefore he is voluntarily dismissing Probst as a party-defendant without prejudice and may seek leave to rejoin Probst at a later date should additional facts bearing on his authority and control come to light.

(Doc. 52 at 3 n.3). Therefore, Mr. Green offers no substantive resistance to Dr. Probst's qualified immunity defense to his federal claims, concedes that he may not have sufficient plausible facts to pursue § 1983 liability against Dr. Probst, and seeks to dismiss him without prejudice.

Mr. Green's plan to preserve the right "to rejoin [Dr.] Probst at a later date" after conducting discovery is antithetical to a properly invoked qualified immunity defense. Further, Mr. Green's failure to substantively address Dr. Bodiford's qualified

---

[10]  Mr. Green also brings this count against individual Defendants Knauss and Waits.

immunity defense to his federal claims constitutes an abandonment of them. Therefore, consistent with the collection of abandonment/waiver cases that are cited in the subsection immediately above, the Partial Motion is **GRANTED** in this respect and Count I (Doc. 29 ¶¶ 116-121) against Dr. Probst for violation of the equal protection clause asserted pursuant to § 1983 and § 1981 is **HEREBY DISMISSED WITH PREJUDICE**.

### 2. The Overlap Between Title VI and the Equal Protection Clause

In *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394 (11th Cir. 1993), the Eleventh Circuit explained Title VI's connection to the Equal Protection Clause:

> Technically speaking, plaintiffs challenge defendants' actions under Title VI itself as well as under the equal protection clause and the Title VI regulations. Since Title VI itself provides no more protection than the equal protection clause–both provisions bar only intentional discrimination, *see Alexander v. Choate*, 469 U.S. 287, 293, 105 S. Ct. 712, 716, 83 L. Ed. 2d 661 (1985)–we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis. Our equal protection discussion should be understood as disposing of plaintiffs' Title VI statutory claims as well.

*Elston*, 997 F.2d at 1406 n.11 (emphasis added). Therefore, based on *Elston*, a plausible Title VI student-on-student harassment claim will share the same *prima facie* elements as a plausible equal-protection student-on-student harassment claim.

### 3.     The Overlap Between Title VI and Title IX[11]

Both sides heavily rely upon the Title IX student-on-student <u>sexual</u> harassment case of *Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015),[12] as illustrative of the appropriate analysis for the court to employ in this case. In *Hill*, "an eighth-grade student at Sparkman Middle School, was raped in a bathroom after school officials decided to use her as bait in a sting operation to catch CJC, another eighth-grade student, in the act of sexual harassment." 797 F.3d at 955-56 (footnote omitted). Unhelpfully, neither side makes an effort to explain why this court should be guided by *Hill* even though Mr. Green's lawsuit involves allegations of student-on-student <u>racial</u> harassment. Further, the undersigned has been unable to locate an Eleventh Circuit case that expressly embraces *Hill* as applicable in student-on-student racial harassment cases.

However, the Eleventh Circuit has indicated in dicta that Title VI and Title IX are compatible statutes. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 911 F.2d 617, 619

---

[11]  Title IX provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681.

[12]  The plaintiff in *Hill* sued under Title IX and § 1983 for student-on-student sexual harassment.

(11th Cir. 1990) ("Title IX was patterned after Title VI of the Civil Rights Act of 1964."), *rev'd on other grounds*, 503 U.S. 60, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992); *Franklin*, 911 F.2d at 619 ("Hereinafter we discuss Title VI and Title IX cases somewhat interchangeably, because we believe it is settled that analysis of the two statutes is substantially the same.").

Additionally, the Fifth Circuit found in the Title VI case of *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015), that borrowing from student-on-student sexual harassment cases to analyze claims of student-on-student racial harassment is appropriate. *See Fennell*, 804 F.3d at 408 ("While *Davis* dealt with sex-based peer harassment under Title IX, *Davis*, 526 U.S. at 636-38, 119 S. Ct. 1661, 'Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.'" (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009))); *see also Fennell*, 804 F.3d at 408 ("As the Tenth Circuit recognized, 'the [Supreme] Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa).'" (quoting *Bryant v. Indep. Sch. Dist. No. I–38 of Garvin Cty.*, 334 F.3d 928, 934 (10th Cir. 2003))).

Therefore, persuasively guided by the Eleventh Circuit in *Franklin*, the Fifth

Circuit in *Fennell*, and the Tenth Circuit in *Bryant*, the court concludes that it may appropriately rely upon *Hill*'s Title IX and § 1983 framework and analysis to address the Title VI and § 1983 student-on-student sexual harassment claims at issue in this action. At the same time, however, the court is mindful of the cases' contrasting procedural postures, as *Hill* was decided on a <u>Rule 56</u> record and Defendants, here, seek dismissal under <u>Rule 12(b)(6) and/or Rule 12(c)</u>.

### B.     Mr. Green's Title VI Harassment Claim Against JSU[13]

Defendants maintain that Mr. Green has not stated a plausible Title VI student-on-student harassment claim against JSU.[14] (Doc. 47-1 at 23-25). The *Hill* court, relying upon *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633, 119 S. Ct. 1661, 1666, 143 L. Ed. 2d 839 (1999), described the standard for student-on-student sexual harassment under Title IX as:

---

[13]   Defendants have clarified in their reply brief that they do not seek a dismissal of Mr. Green's Title VI discrimination claim or retaliation claim against JSU. (*See* Doc. 55 at 3 ("JSU did not move to dismiss the Title VI discrimination and retaliation claims; instead, JSU only moved to dismiss the Title VI harassment claim.")). Therefore, the court's analysis will be limited to the plausibility of Mr. Green's Title VI peer harassment claim against JSU.

[14]  Defendants maintain that Mr. Green has abandoned his Title VI harassment claim against JSU because his opposition brief fails to directly resist a dismissal of this claim. (Doc. 55 at 3 ¶ 4). At the same time, Defendants have also addressed the plausibility of Mr. Green's Title VI harassment claim. Acknowledging that this is a close call, the court ultimately finds no abandonment by Mr. Green by virtue of the peer harassment-based arguments he has made concerning Drs. Bodiford and King pursuant to § 1983 and the overlapping connection that those contentions have with respect to supporting a plausible Title VI harassment claim against JSU. Additionally, the allegations in Mr. Green's Corrected Repleaded Complaint plausibly support a Title VI harassment claim against JSU.

A Title IX funding recipient is liable for student-on-student harassment if it is "deliberately indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650, 119 S. Ct. at 1675. The standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment. *See id.* at 650-53, 119 S. Ct. at 1675-76.

Student-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is "sufficiently severe." *Id.* at 650, 119 S. Ct. at 1674. The plaintiff must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the known harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect." *Id.* at 651-52, 119 S. Ct. at 1675.

The Court imposed this high standard to guard against the imposition of "sweeping liability." *Id.* at 652, 119 S. Ct. at 1675-76. Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651, 119 S. Ct. at 1675. Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender." *Id.* at 651-52, 119 S. Ct. at 1675. Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

*Hill*, 797 F.3d at 968-69 (emphasis added); *see also id.*, 797 F.3d at 969 ("We hold a Title IX plaintiff must prove the funding recipient had actual knowledge that the student-on-student sexual harassment was severe, pervasive, and objectively offensive.").

Then, referencing *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282, 1292–99 (11th Cir. 2007), the *Hill* court listed the five elements needed to support a student-on-student harassment claim:

> First, the defendant must be a Title IX funding recipient. Second, an "appropriate person" must have actual knowledge of the alleged discrimination or harassment. Third, the discrimination or harassment—of which the funding recipient had actual knowledge under element two—must be "severe, pervasive, and objectively offensive." Fourth, the plaintiff must prove "the funding recipient act[ed] with deliberate indifference to known acts of harassment in its programs or activities." Fifth, the plaintiff must demonstrate the discrimination or harassment "effectively barred the victim's access to an educational opportunity or benefit."

*Hill*, 797 F.3d at 970 (citations omitted).

Defendants do not expressly indicate which of these elements lacks plausible factual support. However, based upon the verbiage in their supporting brief–"JSU's response was not 'clearly unreasonable'" (Doc. 47-1 at 24)–the court understands that Defendants are challenging the plausibility of the fourth element only. *See Davis*, 526 U.S. at 648-49, 119 S. Ct. at 1674 ("On the contrary, the recipient must merely respond to known peer harassment <u>in a manner that is not clearly unreasonable</u>.") (emphasis added).

The allegations that Defendants rely upon to show that JSU reacted in a manner that was without deliberate indifference (*i.e.*, not clearly unreasonable) are limited to:

> [G]athering members of the band together to address the alleged conduct (Doc. 29 ¶ 64); communicating with Plaintiff's parents (*Id.* ¶¶ 59-67); scheduling a speaker to discuss diversity (*Id.* ¶ 66); involving the police (*Id.* ¶ 80); and holding a disciplinary hearing. (*Id.* ¶ 90).

(Doc. 55 at 3 ¶ 5). Having studied these allegations in the context of Mr. Green's entire case, the court finds several weaknesses in Defendants' reliance upon them as appropriately supporting a Rule 12 dismissal.

First, gathering the band members together and lecturing them, was, based upon Mr. Green's other well-pleaded allegations, ineffective to end the harassing conduct and JSU had notice of this ineffectiveness. Second, communicating with Mr. Green's parents, was, based upon Mr. Green's other well-pleaded allegations, ineffective to end the harassing conduct and JSU was aware of this ineffectiveness. Third, Mr. Green did not ever allege that JSU <u>actually</u> scheduled a speaker to discuss diversity; instead, Mr. Green alleged that Dr. Bodiford indicated that he <u>would ask for funding</u> for that purpose. Fourth, the decision to involve the police came after Mr. Green and his parents had made several complaints about peer harassment to JSU officials. In any event, based upon Mr. Green's other well-pleaded allegations, involving the police was ineffective to end the harassing conduct and JSU was aware of this ineffectiveness. Fifth, the notice of the disciplinary hearing that Mr. Green received from Dr. King was scheduled for October 5, 2016. Therefore, this

administrative event occurred many months after Mr. Green had made multiple complaints about student-on-student harassment, after Mr. Green had already withdrawn from JSU, and after he had filed this lawsuit. Additionally, Mr. Green did not receive the notice of the disciplinary hearing in a timely manner.

In sum, the court is not persuaded that Defendants' cherry-picked allegations are sufficient to demonstrate that the fourth element of Mr. Green's student-on-student harassment claim is implausibly supported. Importantly, key allegations are excluded from Defendants' subset, including Dr. Bodiford's alleged prior knowledge of ongoing racial harassment before Mr. Green ever formally complained, the lack of any JSU policy disseminated to the students explaining the procedures for reporting and resolving complaints of harassment, the multiple reports and follow-up efforts made by Mr. Green and his parents to get a JSU school official to do something about the ongoing harassment, Dr. Bodiford's failure to closely monitor the situation, Mr. Green's eventual decision to withdraw from JSU when school officials ignored or failed to adequately address the harassing conduct, and Dr. King's nearly one-year delay in scheduling disciplinary hearings after Mr. Green was no longer attending JSU and had filed this lawsuit. Therefore, the court determines, at the pleadings stage, that Mr. Green has plausibly shown that JSU acted with deliberate indifference in addressing his complaints about peer harassment. Bolstering this court's conclusion

is the absence of <u>any</u> authority that was decided on a Rule 12 record and that supports Defendants' position. *Cf. Davis*, 526 U.S. at 649, 119 S. Ct. at 1674 ("<u>In an appropriate case</u>, there is no reason why courts, on a motion to dismiss . . . could not identify a response as not "clearly unreasonable" as a matter of law.") (emphasis added). Accordingly, the Partial Motion is **DENIED** as to the Title VI student-on-student harassment count against JSU.

### C. Mr. Green's Student-On-Student Racial Harassment Counts Asserted Against Drs. Bodiford and King

Remaining for the court to address are: Count I (Doc. 29 ¶¶ 92-100) against Dr. Bodiford for violation of the equal protection clause asserted pursuant to § 1983 and § 1981, and Count I (Doc. 29 ¶¶ 109-115) against Dr. King for the same violation. As the court understands these counts, Mr. Green asserts that Drs. Bodiford and King were deliberately indifferent to race discrimination in the form of peer harassment in violation of the Fourteenth Amendment Equal Protection Clause pursuant to § 1983 and § 1981.[15] More specifically, Mr. Green asserts that the

---

[15] Neither side has suggested that the elements of proof for Mr. Green's state actor claims premised upon peer harassment are substantively different depending upon which statute is invoked. Therefore, the court analyzes Mr. Green's § 1983 and § 1981 peer harassment claims under the same Fourteenth Amendment Equal Protection Clause framework. *Cf. Alexander v. Fulton Cty.*, 207 F.3d 1303, 1314 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) ("[B]ecause the substantive law and proof requirements of Title VII, section 1981, and section 1983 are the same for claims alleging intentional employment discrimination based on race by state actors, this failure to identify the particular basis of liability does not present any insurmountable problems for appellate review." (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d

Individual Defendants did not do enough in responding to his multiple complaints and numerous follow-up efforts made about racial harassment and that their lack of an adequate response plausibly supports the deliberate indifference standard governing student-on-student harassment cases. The Individual Defendants have all asserted qualified immunity as a defense to Mr. Green's student-on-student harassment claims. (Doc. 47-1 at 10-20).

The Eleventh Circuit also had to decide in *Hill* to what extent qualified immunity protected school officials from individual liability under § 1983. As the Eleventh Circuit began its analysis:

> "[A] governmental official ... may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999); *see Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300-02 (11th Cir. 2007) (discussing government officials' liability under § 1983 arising from "right to be free from sex discrimination"); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (applying "deliberate indifference" standard for § 1983 deprivation of constitutional right to be free from sexual harassment). In order to prevail on a claim of deliberate indifference to sexual harassment, <u>a plaintiff must prove the individual defendant "actually knew of and acquiesced in" the discriminatory conduct</u>. *Murrell*, 186 F.3d at 1250 (quotation omitted). Qualified immunity, however, offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

1318, 1330 (11th Cir. 1998) ("[W]e shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.")).

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).

*Hill*, 797 F.3d at 978 (emphasis added).

Based upon the foregoing standards, the Eleventh Circuit concluded in *Hill* that the district court incorrectly granted summary judgment in favor of the principal, one of the school's assistant principals, and a teacher's aide on the basis of qualified immunity. Turning to the plaintiff's claim against the principal first, the Eleventh Circuit expressly invoked its prior "Title IX analysis" and determined that a material factual issue existed "as to whether Principal Blair [acted with deliberate indifference and] violated Doe's constitutional right to equal protection." 797 F.3d at 978. More specifically, the principal was responsible for "craft[ing] and implement[ing] Sparkman's sexual harassment and recordkeeping policies" which were "glaring[ly] inadequat[e]"[16] and "did virtually nothing in response" to the plaintiff's rape. *Id.*

---

[16] More specifically,

> Principal Blair crafted a "catch in the act" policy establishing three exclusive types of evidence sufficient for the school to discipline a student for sexual harassment. First, if students were "caught and proven" performing a sexual act, that would be grounds for disciplinary action. Second, physical evidence of sexual harassment could be sufficient. Third, discipline was warranted if a student admitted guilt. In contrast, "one person saying" sexual harassment occurred "against another person's word does not work." If a student complained that another student propositioned him or her for sex, that fact alone was not enough to warrant discipline "because you've got one word against another without witnesses."

797 F.3d at 957-58 (footnote omitted).

Further, that "deliberately indifferent response . . . depriv[ed] [the plaintiff] of the opportunity to continue attending Sparkman." *Id.* at 979.

Concerning the clearly established law component, the Eleventh Circuit determined that the principal's conduct violated "(2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right[.]" *Hill*, 797 F.3d at 979 (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009))). The Eleventh Circuit further explained that "[t]he relevant question is whether a reasonable government official in Blair's position as principal could have believed that 'doing nothing' to reform Sparkman's sexual harassment and recordkeeping policies in response to CJC's rape of Doe was lawful, in light of clearly established law." *Hill*, 797 F.3d at 979. The Eleventh Circuit concluded that "an official in Blair's position would not have believed doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation." *Id.* (citing *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1261 (11th Cir. 2010)).

The assistant principal was not entitled to qualified immunity because she "acquiesced to and ratified Teacher's Aide Simpson's plan to send Doe alone into a bathroom with a known sexual harasser and have Doe pretend to initially welcome the harasser's sexual advances" and "'every objectively reasonable government

official facing the circumstances' would know this irresponsible plan violated the Equal Protection Clause." *Id.* at 979 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)). The teacher's aide who came up with the rape-bait plan was likewise denied qualified immunity. *Hill*, 797 F.3d at 979-80. However, the Eleventh Circuit affirmed the district court's application of qualified immunity to another vice principal of the school, who "was not ultimately responsible for . . . sexual harassment policies[,]" was subordinate to the principal, and was unaware of the rape-bait plan. 797 F.3d at 980.

Against this backdrop, the court turns to the merits of the Individual Defendants' qualified immunity defense to Mr. Green's equal protection harassment claim. First, as noted above, the court comfortably concludes that the allegations made about Drs. Bodiford and King satisfy the doctrine's threshold discretionary-authority component. *See supra* at 7 n.6 (referencing factual allegations from Mr. Green's Corrected Repleaded Complaint that establish discretionary authority of the Individual Defendants). Therefore, Mr. Green must plausibly allege the violation of a constitutional right by each Individual Defendant and that the "right was clearly established at the time of the alleged violation." *Hill*, 797 F.3d at 978 (internal quotation marks omitted) (quoting *Holloman*, 370 F.3d at 1264).

### 1. Dr. Bodiford

"With regard to the first prong of qualified immunity analysis" and consistent with the court's Title VI analysis, Mr. Green has asserted facts specific to Dr. Bodiford that plausibly support a cognizable equal protection violation based on peer harassment. *Hill*, 797 F.3d at 978. In particular, Mr. Green has alleged that Dr. Bodiford was oftentimes present and overheard numerous racist statements and jokes made by other band members that were directed towards Mr. Green and "d[id] nothing to reform" the harassing conduct or "[JSU]'s [racial] harassment and recordkeepking policies."[17] *Hill*, 797 F.3d at 979. Mr. Green has also asserted that Dr. Bodiford, on more than one occasion, "d[id] nothing" (or effectively nothing) in response to his complaints about racial harassment and that "deliberately indifferent response . . . subjected [Mr. Green] to further [racial] harassment [that culminated in his decision to withdraw and] depriv[ed] [him] of the opportunity to continue attending [JSU]." *Hill*, 797 F.3d at 979.

The court likewise decides that Mr. Green meets the second prong under the "broad statement of principle within the Constitution, statute, or case law" category. *Hill*, 797 F.3d at 979. Persuasively guided by *Hill*, "an official in [Dr. Bodiford]'s

_____

[17] As Mr. Green has alleged in his Corrected Repleaded Complaint, JSU did not even have a written policy on harassment until 2016–after he was no longer attending JSU.

42

position would not have believed doing nothing [or almost nothing] was lawful in light of the clearly established principle that deliberate indifference to [racial] harassment is an equal protection violation." *Hill*, 797 F.3d at 979; *see also id.* ("The relevant question is whether a reasonable government official in [Dr. Bodiford]'s position as [JSU's Band Director] could have believed that 'doing nothing' to reform [the harassing behavior] was lawful, in light of clearly established law."); *see also Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015) (recognizing that cases not "involv[ing] the precise circumstances" can still constitute clearly established law ); *id.* ("But '[e]xact factual identity with a previously decided case is not required.'" (quoting *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011))). Additionally, because the *Hill* case was decided by the Eleventh Circuit <u>before</u> Mr. Green made his complaint to Dr. Bodiford in October 2015, it was clearly established under case law that a school official's response of doing nothing (or effectively nothing) to address a complaint about peer harassment violated the equal protection clause.

## 2. Dr. King

Although Mr. Green does not allege that Dr. King was aware of any harassing behavior before he formally complained about it in 2015, the court, nonetheless, concludes Mr. Green has asserted facts specific to Dr. King that plausibly support a cognizable equal protection violation based on peer harassment. In particular, after

Dr. King learned in November 2015 about Mr. Waits's threatening behavior targeting Mr. Green, he did not call for an internal investigation into what had occurred or schedule any disciplinary hearing. Instead, Dr. King turned the matter over to the police to determine if any criminal activity had occurred. When the police decided not to charge anyone and returned the matter to Dr. King, he did nothing. Further, it was not until nearly a year later and after Mr. Green had withdrawn, that Dr. King (belatedly) sent notice to Mr. Green that disciplinary hearings were scheduled to take place about his complaint over a school-related incident.

Guided by *Hill*, "an official in [Dr. King]'s position would not have believed doing nothing [or waiting nearly an entire year before doing something] was lawful in light of the clearly established principle that deliberate indifference to [racial] harassment is an equal protection violation." *Hill*, 797 F.3d at 979; *see also id.* ("The relevant question is whether a reasonable government official in [Dr. King]'s position as [JSU's Vice President of Student Affairs] could have believed that 'doing nothing' [or waiting nearly a year] to reform [the harassing behavior] was lawful, in light of clearly established law."). Additionally, because the *Hill* case was decided by the Eleventh Circuit <u>before</u> Mr. Green made his complaint to Dr. King in November 2015, it was clearly established within this circuit that a school official's response of doing nothing (or effectively nothing) to address a complaint about peer harassment,

including scheduling disciplinary hearings almost one year after receiving the complaint and also after the complaining student had already withdrawn from school, violated the equal protection clause.

### D. No Other State Actor Claims Remain for the Court To Address

The court acknowledges that, in opposition to the Partial Motion, Mr. Green asserts that his Corrected Repleaded Complaint includes a separate claim or claims against Drs. Bodiford and King on the grounds that they "impaired his contractual rights under 42 U.S.C. § 1981, based upon his race and his participation in protected activity." (Doc. 52 at 4 (emphasis omitted)). He insists that "the complaint contains ample factual support for these claims" and that "the retaliation continues to this day." (Doc. 52 at 5). Mr. Green further indicates that he "intends to seek leave to supplement the complaint to include these intervening acts of retaliation." *Id.*

On September 9, 2016, this court entered an order requiring Mr. Green to replead his complaint in a clear and complete fashion. (Doc. 21). Part of the court's express reasoning for requiring repleader was to provide clarity as to the scope of claims at issue in this lawsuit, given the Individual Defendants' assertion of a qualified immunity defense. (Doc. 21 at 3-4). As part of the court's instructions to Mr. Green, the undersigned prohibited him from utilizing shotgun pleading and made it

clear that "[e]ach claim against each Defendant must be set forth in separately numbered courts." (Doc. 21 at 5).

Regardless of any plausible factual support, Mr. Green has not alleged separate counts against Drs. Bodiford and King for race discrimination or retaliation in his Corrected Repleaded Complaint. Moreover, Mr. Green has not moved to amend his Corrected Repleaded Complaint to include these claims–vaguely discussing them in his opposition brief is an unacceptable moving target and simply not enough to have this court address them as additional claims. Further, treating them as pleaded claims would be in contravention of the court's repleader order and procedurally improper. Therefore, to the extent Defendants seek a dismissal of these unpled claims (as requested in their reply brief), because none of them is properly before the court, that portion of the Partial Motion is **TERMED** as **MOOT**.

V.     **Conclusion**

Therefore, Defendants' Partial Motion is **GRANTED IN PART**, **DENIED IN PART**, and otherwise **TERMED** as **MOOT**. The following counts are **HEREBY DISMISSED WITH PREJUDICE** from Mr. Green's Corrected Repleaded Complaint:

- Count II (Doc. 29 ¶¶ 101-08) against Dr. Bodiford for tort liability asserted under Alabama law;

- Count I (Doc. 29 ¶¶ 116-121) against Dr. Probst for violation of the equal protection clause asserted pursuant to § 1983 and § 1981; and

- Unnumbered Count (Doc. 29 ¶¶ 182-88) against Drs. Bodiford, King, and Probst for intentional and negligent infliction of emotional distress under Alabama law.

Additionally, with no claims pending against Dr. Probst, he is **HEREBY DISMISSED WITH PREJUDICE** from this action. Further, the partial stay previously put into place (Doc. 45) is **HEREBY LIFTED**. Finally, the deadline for the parties to file a new report of planning meeting is no later than June 26, 2017, and the deadline for Drs. Bodiford and King to file an answer (and JSU to file an amended answer) is no later than July 10, 2017.

      **DONE** and **ORDERED** this the 6th day of June, 2017.


                                               **VIRGINIA EMERSON HOPKINS**
                                             United States District Judge